Paul W. Gant and Katherine Gant, Husband and Wife v. Commissioner.
Gant v. Commissioner
Docket No. 54447.
United States Tax Court
T.C. Memo 1957-216; 1957 Tax Ct. Memo LEXIS 34; 16 T.C.M. (CCH) 990; T.C.M. (RIA) 57216; November 22, 1957
*34 James W. Allen, Esq., Third National Bank Building, Nashville, Tenn., for the petitioners. George L. Hudspeth, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined the following deficiencies in and additions to petitioners' income tax: Additions to Tax
Sec. 294
Sec. 294
Year
Deficiency
(d)(1)(A)
(d)(2)
1950
$ 718.82
$345.32
$142.39
1951
1,215.34
1952
970.00
277.88 The issues are (1) whether $3,000 paid by Paul W. Gant, hereafter referred to as petitioner, in each year is deductible by him as a partnership distribution to one B. F. Clinton, and (2) whether petitioner is liable for the additions to tax under section 294 (d)(1)(A), Internal Revenue Code of 1939, for failure to file timely declarations of estimated tax. Katherine Gant is involved here solely because of her joining in returns with petitioner, her husband. The addition to tax under section 294(d)(2) has been conceded and other adjustments in the notice of deficiency are not contested. Findings of Fact Certain facts are stipulated and are hereby found. Petitioner and his wife, residing in McMinnville, *35 Tennessee, filed joint returns for each year with the collector of internal revenue for the district of Tennessee at Nashville, Tennessee. Between petitioner's discharge from the Army, about January 1, 1946 and September 1948, Gulf Refining Company, hereafter referred to as Gulf, employed him as a sales representative for the eastern part of Tennessee, known as the Chattanooga district. His duties as Gulf sales representative in the Chattanooga district entailed assisting distributors of Gulf products, including Clinton. Gulf owned real estate, buildings and other structures in McMinnville, Tennessee, used in the distribution of its products in that area. For several years prior to September 1, 1948, Gulf had leased its bulk distributing plant at McMinnville to Clinton who operated it under written annual agreements running from May 1 through April 30. Prior to the transaction here involved, Clinton owned the delivery equipment, office furniture, fixtures and other personal property used in operating the bulk plant and delivering Gulf products from the plant. This equipment and personal property had a total value of $6,565. The last lease and contract between Clinton and Gulf on *36 the McMinnville bulk plant covered the period May 1, 1948 through April 30, 1949. Clinton's inability to attend properly to the business of distributing Gulf products in McMinnville caused petitioner, as Gulf sales representative, to devote the bulk of his time to managing the McMinnville plant. Clinton's inability, infirmity or disability had existed prior to 1948. Clinton's health was generally bad in August 1948. The Chattanooga district manager for Gulf, having become dissatisfied with the McMinnville operation, decided in the summer of 1948 to replace Clinton as Gulf distributor in McMinnville, and so notified petitioner. Petitioner had learned in advance of the several new Gulf retail outlets that began operating in and around McMinnville in 1948. Petitioner, for that and other reasons, considered the McMinnville Gulf distributorship a good opportunity for him. About August 1, 1948, the Chattanooga district manager met with petitioner and Clinton at Chattanooga to discuss the McMinnville situation. The district manager advised Clinton that his contract for the McMinnville territory would not be renewed in April 1949, and some other person would be given the contract unless *37 Clinton entered into some arrangement with petitioner. The manager wanted to give Clinton an opportunity to retain some interest in the business and suggested to him that he arrange to form a partnership so as not to be completely out. The manager suggested to petitioner an arrangement on a partnership basis. Gulf officials had informed petitioner before August 14, 1948 that he would be granted a lease and contract for operating the McMinnville plant if he and Clinton could come to some agreement concerning it. Petitioner negotiated with Clinton on the basis of an equal partnership, with petitioner purchasing from Clinton a one-half undivided interest in the furniture, equipment and trucks used in the business. Clinton felt the earnings were not then favorable enough for him to want a division of profits. He insisted upon a minimum payment to himself of $250 per month. Clinton wanted certain changes in the contract as orginally written, resulting in a mutual agreement striking out certain items and inserting others. The original beginning paragraphs of the agreement were never changed. On August 14, 1948, petitioner and Clinton entered into a written agreement, the essential *38 portion of which follows: "WHEREAS, B. F. Clinton is now the distributor of Gulf oil products under contract with * * * Gulf * * *, and in the operation of said business is the owner of certain equipment, * * * value of $6,565.00; and "WHEREAS, * * * Clinton desires to retire and turn over said contract to * * * Gant, for which a new contract will be issued by * * * Gulf * * * in the name of * * * Gant; and "WHEREAS, it has been mutually agreed that * * * Gant will purchase a one-half interest in the equipment * * * for * * * $3282.50, to be paid in cash, and in further consideration of the transfer of said distributorship * * * Gant agrees to pay * * * Clinton, * * * $250,00 per month out of the income of the business for and during the life of * * * Clinton, or as long as contract with Gulf prevails; "NOW, THEREFORE, In consideration of the premises and mutual covenants and agreements herein contained, the parties agree as follows: "1. In consideration of * * * $3282.50 cash * * * paid to me, * * * I, B. F. Clinton do hereby sell and transfer to * * * Gant, a one-half interest in the equipment * * *; and I do hereby agree to the transfer to * * * Gant of the contract * *39 * * with * * * Gulf * * * in consideration of the payment to me of * * * $250.00 per month for * * * my natural life, which payments are to be guaranteed * * * by * * * Gant as long as Gant's contract prevails. "2. The one-half interest in the equipment aforesaid now owned by * * * Clinton shall be amortized or depreciated over * * * two years from * * * this contract, and at the expiration of said two years * * * the whole of said equipment shall become the property of * * * Gant, and if prior to expiration of two years B. F. Clinton should die, * * * Gant would be liable only to the estate of * * * Clinton for the * * * one-half interest in the equipment depreciated in proportion to the number of months remaining of the two years * * *. "3. * * * Gant agrees to the foregoing conditions and binds himself to see that the provisions hereof are fully carried out in any contract between him and * * * Gulf * * *, and mutual prime object of this agreement being that * * * Clinton shall be assured of a monthly pension income of $250.00 * * *. "4. This agreement shall become effective and binding * * * at the beginning of September * * * 1948." The parties notified the district manager *40 of the contract on August 15. Petitioner paid Clinton $3,282.50 for a one-half interest in the personal property and Clinton signed a release agreeing to the termination of his contract with Gulf. Clinton contributed no capital to the Gulf distributorship operated by petitioner. Clinton was in no way obligated to share any losses or other obligations incurred in the Gulf distributorship after it was taken over by petitioner. Clinton performed no services in connection with the Gulf distributorship after the time it was taken over by petitioner and was never an employee of petitioner. On September 1, 1948, Gulf leased its bulk plant at McMinnville to petitioner for the period September 1, 1948 through April 30, 1949. On the same day Gulf entered into a consignment agreement with petitioner for the sale of Gulf products until April 30, 1949. Gulf has renewed its contracts with petitioner by letter from time to time until the present. Petitioner has no enforceable rights of renewal in these contracts, they being cancelable at the end of each year upon 30 days' written notice. Petitioner paid Clinton $250 per month during each of 1950, 1951 and 1952, pursuant to the agreement between *41 them. Clinton had no transferable rights or equities in his contracts with Gulf. Responsible officials of Gulf were fully cognizant of the agreement between petitioner and Clinton. Petitioner brought new business to the venture. During 1950 and 1951, petitioner deducted the $3,000 yearly payments in Schedule C of the Form 1040 annual joint returns as compensation paid to Clinton. Petitioner filed no partnership returns (Forms 1065) for the alleged partnership between himself and Clinton. Petitioner and his wife filed a declaration of estimated tax for 1950 on June 15, 1950, declaring an estimated tax of $1,200. They filed a timely declaration of estimated tax for 1951 on March 15, 1951. They filed a declaration of estimated tax for 1952 on June 12, 1952, declaring an estimated tax of $2,700, which was amended on January 15, 1953, by increasing the estimated tax to $3,000. Petitioner and his wife employed a public accountant in McMinnville to keep their books and prepare their tax returns. They filed such declarations of estimated tax and other tax returns and reports and paid such estimated tax and other taxes as the accountant advised them were due to be filed and paid. *42 Petitioner, unable to keep his books or prepare tax returns for himself and the business, made no effort to do so. Petitioner is not entitled to deduct $3,000 paid to Clinton in each of 1950, 1951 and 1952 in computing taxable net income for those years. Failure of petitioner and his wife to file timely declarations of estimated tax for 1950 and 1952 was not due to reasonable cause. Petitioner and his wife substantially underestimated their 1950 estimated tax. Opinion Petitioner originally deducted the payments to Clinton, his vendor, as compensation for personal services. It seems now to be conceded that there is no justification for such treatment. The principal contention appears to be that a partnership or joint venture was created. But we think the contract which finally evolved from the negotiations precludes any such approach. While the parties, or at least petitioner, may have originally negotiated with the objective of a joint venture, petitioner's own testimony and the contract itself seem to us to leave no alternative but that Clinton wanted to be paid a specific annual amount, denominated a pension, in exchange for what was an outright transfer, although partly *43 postponed, of all his assignable interests. He contributed neither services nor property to any venture, had no control, shared in neither profits nor losses, and presumably was given no authority to bind or commit the venture. Edward C. James, 16 T.C. 930, affd. (C.A. 5) 197 Fed. (2d) 813; Roland P. Place, 17 T.C. 199, 205, affirmed per curiam (C.A. 6) 199 Fed. (2d) 373. It is difficult to see that this was in any respect different from any other sale of property, especially of a kind comparable to a going business. The contract itself gives the value of the equipment which was sold. "We have heretofore held that in a capital transaction such as that involved in this proceeding, an amount paid in excess of the value of tangible assets purchased is not a deductible business expense, but constitutes a capital expenditure." Saline Motor Co., 22 B.T.A. 874, 875. Whether what was purchased with this excess was good will, going concern value, or some other intangible, we need not pause to determine. All would have an indefinite anticipated life and, for that reason, be incapable of depreciation. Xpando Corporation, 7 T.C. 48; *44 Nachman v. Commissioner, (C.A. 5) 191 Fed. (2d) 934, affirming 12 T.C. 1204. Such items may indeed not depreciate at all but be worth as much at the time the business is ultimately sold as they were when originally acquired. X-Pando Corporation, supra. It follows that while payments made by petitioner to Clinton are capital investments and will presumably increase his basis as they continue to be paid and as time goes on, they must be recovered when the business is sold or otherwise disposed of, Nachman v. Commissioner, supra, and not by way of amortization or depreciation over an entirely unascertainable future period. Associated Patentees, Inc., 4 T.C. 979, is not analogous for several reasons. There the percentages paid each year to the patentholders and which were allowed to be deducted as depreciation were said to be "a cost pertaining to that year alone and measured by income over that period." ( Italics added.) Furthermore, we said: "Respondent's regulations recognize the fact that there is no fixed rule, but that the cost should be apportioned over the useful life in such ratable amount as may reasonably be considered *45 necessary to recover during the remaining useful life of the property the unrecovered cost or other basis." (Italics added.) Neither statement can properly be made here. The total monthly payments made to Clinton were in fixed amounts and had no relation to the current income of the business. That was, in fact, one of the conditions upon which Clinton had insisted. And we are given no information about the anticipated useful life of the property purchased with these payments. As to the intangibles, indeed, we think there could be no such showing. We are consequently unable to apply here the approach employed in Associated Patentees, Inc., supra.See also John A. Nelson Co., 28 B.T.A. 529, affirmed on other issues (C.A. 7) 75 Fed. (2d) 696, reversed on other issues 296 U.S. 374. Respondent did not err in disallowing the deductions sought. Respondent determined against petitioners additions to the tax under section 294(d)(1)(A) for failure to file timely declarations of estimated tax, and under 294(d)(2) for substantial underestimation. The latter seems now to be conceded. As to the former, what we said in Walter H. Kaltreider, 28 T.C. 121, 126, *46 is equally applicable: "Here, as there, no proof has been presented that petitioners' accountant was qualified to advise them concerning tax matters. As revealed by the record he had been a public accountant * * *. No other qualifications have been shown. Though petitioners may have relied upon him in the preparation and filing of their returns, there is no evidence that their reliance was well placed. We therefore conclude that the petitioners' failure to file the declaration required by the statute was not due to reasonable cause." Decision will be entered for the respondent.